1
2
3
4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   BONNIE JUE, D.D.S,                    Case No.  19-cv-08299-WHO

8                      Plaintiff,

9         v.                             **ORDER DENYING PLAINTIFF'S**
                                         **MOTION FOR PARTIAL SUMMARY**
10                                       **JUDGMENT AND GRANTING**
    UNUM GROUP, et al.,                  **DEFENDANTS' MOTION FOR**
                                         **PARTIAL SUMMARY JUDGMENT**
11                     Defendants.
                                         Re: Dkt. No. 25, 33
12

13                        **INTRODUCTION**

14         This is an insurance disability case involving a disputed termination of disability benefits

15   in which the parties have submitted cross motions for partial summary judgment.  Plaintiff Bonnie

16   Jue, DDS, moves for summary judgment on her claim for breach of contract on the basis that

17   defendants Unum Group and Unum Life Insurance Company of America ("Unum") waived the

18   right to insist that she undergo De Quervain's surgery as the "appropriate treatment" for her

19   condition under her insurance policy.  Unum opposes the motion and moves for summary

20   judgment on Jue's claim for breach of the implied covenant of good faith and fair dealing and

21   request for punitive damages, arguing that these claims fail as a matter of law because there is a

22   "genuine dispute" whether Unum was justified in terminating Jue's benefits and because Jue has

23   failed to put forth evidence that Unum acted with malice, oppression, or fraud.  For the reasons

24   discussed in detail below, Jue's motion for partial summary judgment on the breach of contract

25   claim is DENIED because there are material facts in dispute; Unum's actions in 2001 did not

26   estop it from reevaluating Jue's ongoing claim in 2018 as a matter of law.  There are genuine and

27   reasonable disputes of fact concerning Unum's reevaluation and its conduct was not inequitable,

28   nor did it put Jue at a disadvantage.  Its motion for partial summary judgment on the breach of

United States District Court
Northern District of California

implied covenant of good faith and fair dealing claim and punitive damages demand is GRANTED.

**BACKGROUND**

**I.   THE POLICY**

Jue graduated from the University of Pacific School of Dentistry in 1993, became a licensed dentist in California, and began work as a general dentist at her father's dental practice. Dkt. No. 25-2 ("Jue Decl.") ¶ 2.  She purchased an "own-occupation" disability insurance policy in 1994 from Unum Life Insurance Company of America ("Unum").  *See* Jue Decl., Ex. A. (the "Policy").  Under the Policy, Unum agreed to pay total or residual disability benefits of up to $4,499 per month to Jue if she became sick or injured and unable to work, or work only part-time, as a dentist.  The Policy's definitions of total and residual disability require that the insured is "receiving medical care from someone other than yourself which is appropriate for the injury or sickness." *Id.* at UA-POL-IDI-DUP-000019.  It further states, "We will waive this requirement when continued care would be of no benefit to you." *Id.*

**II.   1998 – ONSENT OF DISABILITY AND INITIAL CLAIM**

In 1998, following the birth of her first child, Jue developed swelling and pain in both wrists and was diagnosed with De Quervain's Tenosynovitis.  Jue Decl. ¶ 4.  This condition involves swelling of the tendons at the base of the thumb leading to compression of nearby nerves, causing pain and numbness, especially with repetitive or prolonged pinching and grasping motions. *Id.*  In September of 1998, Jue submitted a claim for disability benefits to Unum.  *Id.*, Ex. B.  In that claim her rheumatologist, Dr. Carteron, identified her condition as De Quervain's, stated she was restricted from using her hands repetitively and to grip, opined that she was unable to perform dental procedures with her hands, and estimated that her condition would fundamentally change in 5-6 months. *Id.* at UA-CL-IDI-000139.

On October 1, 1998, Tony Sides, an Unum claims adjuster, spoke with Jue about her claim.  Dkt. No. 25-1 ("Coleman Decl."), Ex. B at UA-CL-IDI-000126.  Notes from the call indicate that Jue told Sides possible treatments for her condition might include "steroid injection" and "[s]urgery as last resort." *Id.*  In November 1998, Lisa Stiffler, R.N. provided Sides with a

United States District Court
Northern District of California

memorandum based on her review of Jue's medical records.  *See* Coleman Decl., Ex. B at UA-CL-IDI-000059.  In the memo, Stiffler described the appropriate treatment for Jue's condition:

> What would be considered appropriate treatment?  Treatment is symptomatic relief provided by rest, immobilization (splint), NSAIDS, analgesic agents, heat-cold, and controlled exercises.  Steroid injections may be helpful and surgical exploration may be considered in persistent cases, but is rare.  The insured has undergone a series of conservative treatments and is continuing to show slow progress.  Treatment has been appropriate.

*Id.* at UA-CL-IDO-000060.  Stiffler also determined that because Jue had seen improvement in her condition, "the insured has a good prognosis for a complete recovery." *Id.*

On December 9, 1998, Unum approved Jue's disability claim, agreeing to pay total disability benefits for July 26, 1998 through January 12, 1999 and 50% residual disability benefits from January 12 through February 1, 1999, when Jue was expected to transition back to work.  *See* Jue Decl., Ex. D at UA-CL-IDI-000040.  Unum's letter to Jue further stated that she should contact Unum if she was not able to return to work full time by February 1, 1999 or believed that she qualified for any further residual disability benefits.  *Id.*

### III.     1999 – JUE RENEWS DISABILITY CLAIM

In March 1999, after unsuccessfully attempting to return to work full time, Jue filed a renewed claim for disability benefits.  *See* Jue Decl., Ex. E.  Her claim included a new attending physician progress statement from her rheumatologist, Dr. Carteron, which indicated that Jue was not able to perform dentistry work more than two or three days a week, that she was taking an anti-inflammatory and had undergone physical therapy, and estimated that she was not likely to fundamentally improve within the next six months.  *Id.* at UA-CL-IDI-000522.

In May 1999, Unum had internist John LoCascio, MD, conduct a medical review of her claim.  Coleman Decl. Ex. B at UA-CL-IDI-000485-UA-CL-IDI-000486.  LoCascio's resulting memorandum indicated that her persistent pain, despite standard treatment for De Quervain's, was "somewhat puzzling and unusual" and that the "prognosis in this case is worrisome." *Id.*  He further stated, "The treatment rendered for deQuervain tenosynovitis including hand physical therapy does appear to be reasonable at this juncture" but expressed concern that there was no evidence of a functional capacities evaluation or chronic pain evaluation in Jue's case. *Id.*  Unum

United States District Court
Northern District of California

1    approved Jue's claim for residual benefits on June 24, 1999.  *See* Jue Decl., Ex. F.

2    **IV.    1999 - 2003 – JUE'S CONDITION PERSISTS**

3         Following the approval of her residual disability benefits, Jue periodically provided Unum

4    with updates regarding her condition, treatment, and work frequency.  On December 2, 1999, she

5    spoke with a claim servicer for Unum and explained that she was not seeing Dr. Carteron on a

6    regular basis, but only when she had a flare up.  Coleman Decl., Ex. B at UA-CL-IDI-000415.

7    She also told Unum that her wrist and thumb were improving each month.  *Id.*  A note from

8    Unum's claim file for Jue's case indicates that following this call, Unum planned to "[o]btain upd.

9    med recs based on frequency of med care & watch for surgery."  *Id.* at UA-CL-IDI-000167.

10        In December 2000, Jue consulted a hand surgeon, Dr. George Wu, for a second opinion

11   regarding her condition.  Jue Decl. ¶ 14.  Dr. Wu submitted an attending physician statement to

12   Unum confirming Jue's diagnosis of De Quervain's.  Jue Decl., Ex. H at UA-CL-IDI-000286.  In

13   his statement, Dr. Wu indicated that she planned to "attempt corticosteroid injection at the end of

14   Jan. 2001."  *Id.*  He further stated that she "may eventually need surgical treatment if she fails

15   corticosteroid injection treatment."  *Id.*  Jue returned to see Dr. Wu in late February, but did not

16   receive a corticosteroid injection because she was busy with work and concerned that she would

17   not be able to work immediately after the injection.  Butler Decl., Ex. 11(b) at UA-CL-IDI-

18   000639.

19        On March 1, 2001, Jue spoke with Unum claims representative Cheryl Collin.  Coleman

20   Decl., Ex. B at UA-CL-IDI-000274.  Collin has since left Unum and is not available as a witness,

21   but her notes from the call document the conversation as follows:

22        Spoke w/ insured.  She wanted to discuss the fact that she has Chronic Tendonitis
         and has had it for a while.  Switched specialist.  Saw him yesterday, the wrist is
23        inflamed.  She has been taking napasin, which helps for a little while.  The
         specialist would like to suggest to her to have steroid injections to relieve the
24        inflammation or at least for a couple of mos or to have surgery.  She works ½ the
         time w/out much problem, if she works more it swells.  She wanted to know if she
25        chooses not to have surgery would it affect her benefits, I told her that we cannot
         force her to have surgery, that if she chose not to have surgery it would not affect
26        her benefits.  She thanked me.

27   *Id.*  In May, 2001, Unum had a nurse review and assess Jue's file.  *See* Butler Decl. Ex. 13.  The

28   reviewer noted that Jue was planning to schedule a time to receive a corticosteroid injection and

1   might need surgical treatment eventually.  *Id.* at UA-CL-IDI-000224.  The reviewer recommended

2   that Unum "re-look at medical in 6 months" because "steroid injections and/or surgery may be

3   pursued."  *Id.*  Unum did not proceed to follow up and instead continued to pay Jue residual

4   disability benefits until fall of 2002.

5           In September 2002, Jue applied for total disability benefits from Unum as she had stopped

6   working entirely as a result of her second pregnancy, which exacerbated her symptoms.  *See*

7   Butler Decl., Ex. 14.  Unum approved the claim.  Butler Decl. ¶ 16.

8           In March 2003, Jue informed Unum that she had returned to work part time.  Coleman

9   Decl., Ex. B at UA-CL-IDI-000646.  The Unum claim representative's notes from the call state

10  "She has not seen Dr. Wu since late last year.  She states that the only treatment option left is

11  surgery.  If surgery is performed she feels that she may not work at all."  *Id.*  On March 20, 2003,

12  Unum sent Jue a letter noting that she would be considered for eligibility under the residual

13  provision of her policy going forward.  Butler Decl., Ex. 15 at UA-CL-IDI-000652.  The letter

14  noted that Dr. Wu's medical records indicated that Jue had not received medical treatment from

15  him since February 2001 and requested that she have Dr. Wu provide an updated attending

16  physician statement on her condition.  *Id.*

17          In April 2003, Dr. Wu submitted an updated attending physician statement to Unum on

18  Jue's behalf.  *See* Butler Decl., Ex. 16(b).  Dr. Wu's statement indicated that Jue had continued

19  symptoms and must limit use of her hands for sustained gripping, pinching, or pushing, and should

20  not work more than one day a week.  *Id.* at UA-CL-IDI-000697.  It also stated that she was not

21  taking any medications because she was still nursing.  *Id.*  The statement indicated that Dr. Wu's

22  treatment goal was to return her to work and that he was awaiting results for blood and serum

23  testing to further evaluate her condition.  *Id.*  Unum resumed providing Jue residual disability

24  payments after receiving Dr. Wu's updated physician statement.

25          On December 8, 2003, Jue contacted Unum to request that her claim be placed on annual

26  certification – which would reduce the frequency with which she would need to provide Unum

27  with updates on her condition.  Coleman Decl., Ex. B at UA-CL-IDI-000714.  The Unum

28  representative's notes from the call state "She has explained that her condition will not change

United States District Court
Northern District of California

w/out surgery.  She is only 33 and doesn't want surgery at this time." *Id.*  The notes also indicate that Jue told her representative she was "considering seeking another opinion" and agreed to inform Unum if that opinion differed from Dr. Wu's.  *Id.*  Following this call, Jue's claim was transferred to Unum's extended duration unit, whose function was administrative claim monitoring, rather than active claim management.  Butler Decl. ¶ 19.

## V.   2004-2011 – UNUM PAYS BENEFITS WITH MINIMAL MONITORING

From 2004 to 2011 Unum continued to pay Jue residual benefits while exercising minimal oversight of her claim.  During this time, she submitted annual claimant statements as well as monthly income statements from her office so Unum could calculate her residual benefits.  Butler Decl. ¶ 20.  Dr. Wu also submitted several attending physician statements on her behalf during this time.  In April 2004, Dr. Wu submitted a statement indicating that she had received a corticosteroid shot in her left wrist, which resulted in some pain reduction but did not permit her to return to full-time work.  Butler Decl., Ex. 18 at UA-CL-IDI-000762.  In October 2005, he submitted an updated statement indicating that she was still experiencing pain and could not work on a full-time basis.  *Id.* at UA-CL-IDI-000871.  He further stated "[p]atient is considering surgical remedy" and commented, "[h]opefully she will accept the concept of surgical remedy of the condition as she is fearful of surgery."  *Id.*  In December 2007, he submitted a final statement indicating that Jue still could not work full-time and was currently being treatment with "trial of biofeedback training" and "workstation ergonomics."  *Id.* at UA-CL-IDI-000926.  He noted in this statement that she was "fearful of injections or surgery."  *Id.*

From 2008-2011, Jue did not submit any attending physician statements to Unum and Unum did not press her to do so.  Unum conducted an internal review of her claim in 2009 to assess whether the claim was being properly managed.  *See* Colman Decl., Ex. B at UA-CL-IDI-001088.  The reviewer concluded that her condition appeared "permanent" based on Dr. Wu's statement from 2007 and that "[i]t does not appear that any changes are expected."  *Id.*  The reviewer recommended that Unum obtain updated physician statements and tax documents from her, but otherwise concluded that "handling appears appropriate as nominal" and suggested returning the claim to the extended duration unit.  *Id.*  In 2012, Unum requested that Jue provide

1    an updated attending physician statement and a new physician, Dr. Susan Hsu, subsequently

2    submitted one on her behalf.  Dkt. No. 33-4 ("Bernacchi Decl.") ¶ 2.

3    **VI.    2015 – REFERRAL TO VALIDATION UNIT**

4            In 2015, Jue's father merged his dental practice into a new company called Apple Tree

5    Dental in San Mateo.  Butler Decl. ¶ 21.  In September 2015, Jue sent a letter notifying Unum that

6    she had transferred to the new Apple Tree practice.  Butler Decl., Ex. 19.  In the letter, she noted

7    that she had been compensated for computer training at the new practice from April 20, 2015 to

8    May 30, 2015, but explained that she did not think that income should be counted as dental

9    income for purposes of calculating her residual benefit.  *Id.*  Following this email, her claim was

10   referred to Unum's validation unit, a group that handles long-term claims requiring more active

11   claims management.  Butler Decl. ¶ 21.

12           In December 2015, Unum sent Jue a letter indicating that it would not count her computer

13   training income as dental income for purposes of calculating her residual benefit, but also

14   instructed her to provide supplemental information that was missing in her file, including a current

15   attending physician statement and various tax returns and pay records.  Butler Decl., Ex. 9(b) at

16   UA-CL-IDI-001827.  She submitted an updated claim form and attending physician statement

17   from Dr. Hsu in October 2016, in which Dr. Hsu stated that "improvement [was] not expected" for

18   her condition.  *See* Butler Decl., Ex. 20.

19           In December 2016, Unum had Dr. John Groves, a hand surgeon, conduct a medical review

20   of Jue's file.  Butler Decl. Ex. 23 at UA-CL-IDI-002325-002326.  Dr. Groves concluded that her

21   current condition was unclear because there was no recent evidence of a physical exam supporting

22   her diagnosis, noted that surgery was likely an appropriate treatment if her condition was

23   persistent, and recommended getting in contact with Dr. Hsu.  Butler Decl., Ex. 21 at UA-CL-IDI-

24   002325-002326.  Dr. Groves subsequently contacted Dr. Hsu, who agreed that a good next step to

25   assess Jue's condition and appropriate treatment would be for Jue to undergo an independent

26   medical examination.  Butler Decl., Ex. 22 at UA-CL-IDI-002334.

27           Jue participated in an independent medical examination in June 2017 by Dr. Mathias

28   Masem.  Butler Decl., Ex. 24(a) at UA-CL-IDI-002765-002769.  Dr. Masem confirmed Jue's

United States District Court
Northern District of California

diagnosis of De Quervain's and opined that surgery would be an appropriate treatment for her condition, noting that she had been a candidate for surgery since 2000 but had resisted the procedure.  *Id.*  Dr. Masem further opined that "[t]he complication rate from DeQuervain's surgery is extremely low, and the results are generally good" but noted that it was unclear whether the surgery would allow Jue to return to work full time.  *Id.*  Dr. Groves reviewed Dr. Masem's assessment and concluded that Jue was not pursuing the appropriate treatment for her condition, which he determined was De Quervain's surgery.  Butler Decl., Ex. 24(b) at UA-CL-IDI-002774.  He subsequently spoke again with Dr. Hsu, who generally acknowledged that surgery was appropriate for persistent De Quervain cases but noted that Jue was reluctant to undergo surgery due to the risk of a bad outcome.  *Id.* at UA-CL-IDI-002795.  In October 2017, Unum sent Jue a letter explaining that her policy required her to obtain appropriate treatment for her condition, that Unum had determined the appropriate treatment for her condition was surgery, and that she was to schedule surgery within 90 days or Unum would discontinue her benefits.  Butler Decl., Ex. 26 at UA-CL-IDI-002891-002893.

In January 2018, Jue notified Unum that she had been examined by a hand surgeon, Dr. Kilaru, and was returning to see him on January 31, 2018, at which time he would further evaluate her for possible surgery.  Butler Decl., Ex. 27 at UA-CL-IDI-002934.  The Unum representative informed Jue that Unum would not stop benefits at that time because she was pursuing treatment with Dr. Kilaru and that Unum would consider his opinion.  *Id.*

In early February 2018, Jue emailed Unum and explained that she had recently returned to Dr. Kilaru for treatment.  Butler Decl., Ex. 28.  She stated in the email that Dr. Kilaru had given her the option to either continue conservative treatment of her condition or surgery.  *Id.* at UA-CL-IDI-002989.  Jue further represented that Dr. Kilaru had told her that conservative maintenance was "appropriate care" for her condition.  *Id.*

In March 2018, Dr. Groves spoke with Dr. Kilaru to discuss Jue's case.  Butler Decl., Ex. 29(a).  A letter memorializing the call indicates that Dr. Kilaru believed that if corticosteroid injections he had administered to Jue did not allow her to return to work on a full-time basis, De Quervain's surgery was the next appropriate treatment step.  *Id.* at UA-CL-IDI-003018.  The letter

8

United States District Court
Northern District of California

1    also reflects that Dr. Kilaru had reviewed the independent medical examination report prepared by

2    Dr. Marsem and agreed with Dr. Marsem's assessment of appropriate treatment.  *Id.*

3           Dr. Kilaru conducted a follow-up visit with Jue in April 2018, during which he observed

4    that she had seen only temporary improvement from the corticosteroid shots.  Butler Decl., Ex.

5    29(b) at UA-CL-IDI-003061.  He recommended surgery, but she explained that she did not want

6    surgery.  *Id.*

7           In May 2018, Unum sent Jue a termination of benefits letter on the basis that she was not

8    pursuing appropriate treatment for her condition.  Butler Decl., Ex. 30 at UA-CL-IDI-003079.

9    The letter noted that Jue could appeal Unum's decision.  *Id.*  After receiving no response and

10   being unable to reach Jue by phone, Unum sent a subsequent letter in June 2018, reiterating that it

11   was discontinuing her disability benefits and that she had a right to appeal.  *Id.* at UA-CL-IDI-

12   003104.  In November 2018, Jue submitted a treatment note from Dr. Hsu, who noted that Jue's

13   condition had worsened and opined that Jue had valid concerns about the surgery because no

14   surgeon could guarantee that her condition would not worsen.  Butler Decl., Ex. 31 at UA-CL-IDI-

15   003120-3123.  Dr. Hsu stated that "she is making an appropriate choice for her condition and thus

16   conservative maintenance would be appropriate care under her circumstances."  *Id.*

17          Unum reviewed and considered Dr. Hsu's medical note, but ultimately concluded that the

18   opinions of the three hand surgeons who had reviewed Jue's condition and recommended surgery

19   were persuasive.  Butler Decl., Ex. 32 at UA-CL-IDI-003157.  In April 2019, Unum sent Jue a

20   letter informing her that it had completed review of her appeal and that it would move forward

21   with its decision to terminate her benefits for failure to obtain appropriate medical treatment.  *Id.*

22   at UA-CL-IDI-003150.

23                                  **LEGAL STANDARD**

24          Summary judgment on a claim or defense is appropriate "if the movant shows that there is

25   no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

26   law."  Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show

27   the absence of a genuine issue of material fact with respect to an essential element of the non-

28   moving party's claim, or to a defense on which the non-moving party will bear the burden of

United States District Court
Northern District of California

1   persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has

2   made this showing, the burden then shifts to the party opposing summary judgment to identify

3   "specific facts showing there is a genuine issue for trial." *Id.* 324.

4        The party opposing summary judgment must then present affirmative evidence from which

5   a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257

6   (1986). On summary judgment, the Court draws all reasonable factual inferences in favor of the

7   non-movant. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the

8   drawing of legitimate inferences from the facts are jury functions, not those of a

9   judge." *Id.* (citation omitted). "The mere existence of a scintilla of evidence in support of the

10  plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably

11  find for the plaintiff." *Id.* at 242.

12                                    **DISCUSSION**

13  **I.    JUE MOTION FOR PARTIAL SUMMARY JUDGMENT**

14       Jue moves for summary judgment on her contract claim on the bases of waiver and

15  estoppel. She argues that Unum waived its right to insist that Jue have surgery as a condition of

16  receiving benefits and/or should be estopped from requiring Jue to obtain surgery. Dkt. No. 25

17  ("Jue Mot."). Unum opposes the motion on three primary bases: (1) Jue's complaint does not

18  adequately allege her waiver and estoppel theories; (2) waiver and estoppel cannot create an

19  entitlement to future benefits under controlling case law; and (3) there are material facts in dispute

20  whether Unum waived its right to insist that Jue obtain surgery and/or should be estopped from

21  requiring her to obtain surgery. Dkt. No. 32 ("Unum Opp.") at 13-25.

22       While I do not find Unum's first and second arguments convincing, I agree the factual

23  issue of waiver cannot be determined as a matter of law. Further, I conclude that Jue has failed to

24  carry her burden, as a matter of law, on the issue of estoppel, which is "a nonjury fact question to

25  be determined by the trial court in accordance with applicable law." *DRG/Beverly Hills, Ltd. v.*

26  *Chopstix Dim Sum Café & Takeout III, Ltd.*, 30 Cal. App. 4th 54, 61 (1994)

27       **A.    Unum's Procedural and Legal Challenges to Jue's Motion**

28       Unum's first two arguments in opposition to Jue's motion contend that her waiver and

                                          10

United States District Court
Northern District of California

1   estoppel arguments fail: Jue did adequately allege these positions in her Complaint, and waiver

2   and estoppel can create a right to future benefits in specific and limited circumstances.  Because

3   these Unum's arguments pose broad legal attacks to both Jue's waiver and estoppel claims, I will

4   address them first.

5          **1.**     **Sufficiency of Jue's Waiver and Estoppel Allegations**

6          Unum argues that Jue's motion is procedurally improper and should be denied because Jue

7   failed to adequately plead waiver or estoppel in her Complaint.  Unum Opp. at 14.  It notes that

8   federal pleading standards require that a plaintiff "give the defendant fair notice of what the claim

9   is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545

10   (2007).  And it points out that "despite the liberal pleading standard for civil complaints, plaintiffs

11   may not raise new claims at the summary judgment stage."  *White v. Beltram Edge Tool Supply,*

12   *Inc.*, 789 F.3d 1188, 1200 (11th Cir. 2015).  Unum acknowledges that Jue's Complaint briefly

13   alleges waiver and estoppel, but argues that this is insufficient because Jue did not bring waiver or

14   estoppel as separate claims and because "there is no discussion in the Complaint of the underlying

15   facts giving rise to them."  Unum Opp. at 14.

16          Although Jue's Complaint does not contain extensive allegations regarding waiver and

17   estoppel, I do not agree with Unum that Jue's allegations are so deficient as to preclude

18   consideration of them at the summary judgment stage.  The Complaint contains a brief, but

19   explicit, allegation regarding waiver and estoppel in the context of Jue's breach of contract claim:

20   it states that defendants "are estopped from asserting and have waived all contractual provisions, if

21   any, purporting to limit their obligations to provide benefits."  Dkt. No. 1-1 ("Complaint") at ¶ 31.

22   While it is true that Jue did not bring waiver or estoppel as separate claims, she is not asserting

23   them as separate claims now.  Rather, she argues that she is entitled to summary judgment on her

24   breach of contract claim because Unum has waived the right to demand, or should be estopped

25   from demanding, that she have hand surgery and that there are no other factual disputes as to her

26   entitlement to benefits.  This is perfectly consistent with the Complaint, which alleges waiver and

27   estoppel as part of Jue's breach of contract allegations.  As a result, the cases Unum cites, barring

28   plaintiffs from raising new *claims* at summary judgment, are not on point; Jue is not asserting any

new claims.

Further, the Complaint contains at least some allegations relevant to Jue's waiver and estoppel arguments.  She alleges in the Complaint that Unum investigated and approved her claim to benefits and paid her claim for many years before changing course and determining that Jue "no longer met the Policy's purported requirement of 'receiving medical care from someone other than yourself which is appropriate." Complaint ¶ 22.  This is consistent with her argument that Unum is estopped or has waived the right to insist on hand surgery in part because it approved her claim without insisting on that treatment for a fifteen-year period.  *See* Jue MSJ at 12.  These allegations are sufficient to meet the liberal Rule 8 pleading standard.

Jue's allegations regarding waiver and estoppel are sufficient and do not bar her from raising these issues on summary judgment.

### 2.     Whether Jue's Motion Fails Because Waiver and Estoppel Cannot Create Coverage for Future Benefits

Unum argues that Jue's waiver and estoppel arguments fail as a matter of law because waiver and estoppel cannot create a right to future coverage.  It relies primarily on *Erreca v. Western States Life Ins. Co.*, 19 Cal. 2d 388, 402 (1942), in which the California Supreme Court rejected the argument that an insurer had waived the right to insist on an independent medical examination, and to enforce any policy requirements against the insured, because it had previously refused to pay disability benefits.  The Court explained that because a disability insurance contract constitutes "a continuing contract for periodic installment payments depending upon the insured's continued disability," an insurer's alleged breach or failure to pay under the contract does not permit the insured "to treat the entire contract as repudiated and ask for future benefits upon a theory of anticipatory breach." *Id.*  Unum also cites *Aetna Casualty & Surety Co. v. Richmond*, 76 Cal. App. 3d 645, 652-53 (1977) for the proposition that waiver and estoppel "are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom."

Although the cases Unum cites clearly establish some limitations on the application of waiver and estoppel in the insurance context, they are not directly on point and do not clearly bar

Jue's invocation of these doctrines as a matter of law. For example, Jue is not arguing that Unum has broadly waived the right to assert any policy provisions against her, but that Unum specifically waived the right to insist that she obtain surgery for her condition. This is a much narrower waiver than the court addressed in *Erreca*, which does not go so far as to hold that waiver and estoppel are completely inapplicable in disability insurance cases. Further, Jue is not attempting to use waiver or estoppel to expand the scope of her disability coverage, as in *Aetna*.

Courts have applied waiver and estoppel to limit an insurer's ability to assert certain defenses or policy provisions in the disability insurance context. *See August v. Provident Life and Accident Ins. Co.*, 772 F. Supp. 2d 1197, 1208 (C.D. Cal. 2011) (holding that insurer was estopped from terminating benefits based on a justification that injury was the result of "late-blooming sickness" where insurer accepted claim based on accident and did not inform insured of its sickness determination until ten years later). Unum has failed to demonstrate that Jue's waiver and estoppel arguments fail as a matter of law on this basis.

### B.    Unum's Disputed Facts Challenge

Unum argues that Jue's motion should be denied because there are material factual disputes as to waiver and estoppel. I agree that the facts regarding waiver are not sufficiently clear to resolve this issue as a matter of law at the summary judgment stage. Estoppel, in contrast, is "a nonjury fact question to be determined by the trial court in accordance with applicable law." *DRG/Beverly Hills*, 30 Cal. App. 4th at 61. I conclude that Jue has failed to carry her burden to establish estoppel.

#### 1.    Waiver

"Like any other contracting party, an insurance company may waive provisions placed in a policy solely for its own benefit . . ." Waiver "is the intentional relinquishment of a known right after knowledge of the facts." *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 31 (1995). "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." *Id.* "Whether there has been a waiver is usually regarded as a question of fact to be determined by the jury, or by the trial court if there is no jury." *Posner v. Grunwald-Marx, Inc.*, 56 Cal. 2d 169, 189 (1961). "However, the trial court

13

may properly resolve an issue of waiver as a question of law when the underlying facts are undisputed." *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 679 (2000). Where there are disputes or conflicting evidence regarding a party's intent or the parties' understanding as to a particular statement or representation, waiver is generally "not resolvable as a matter of law." *Id.*

To support her waiver argument, Jue relies heavily on Cheryl Collin's statement to her in 2001, in which Collin reportedly told her that Unum "cannot force her to have surgery, that if she chose not to have surgery it would not affect her benefits." Coleman Decl., Ex. B at UA-CL-IDI-000274. Jue further notes that following this representation, Unum did not insist that she obtain surgery for a fifteen-year period, even though her physician, Dr. Wu, suggested surgery as a possible treatment for her condition as early as 2000. Jue. Mot. at 11-12. She points out that from 2001 – 2016, she and Unum repeatedly acknowledged that surgery was a potential treatment for her condition, that she consistently communicated that she was reluctant or unwilling to get surgery, and that during this time, Unum never insisted that she get surgery. *Id.* On these facts, she argues that Unum indisputably waived the right to insist that she get hand surgery to fulfill the "appropriate treatment" requirement of her policy. *Id.*

While the facts she cites could permit a finding of waiver, Unum has submitted additional evidence that could permit a finding against waiver. For example, Unum highlights the context of Jue's conversation with Collin in 2001, which occurred only a few years after Jue was first diagnosed with De Quervain's and while she was undergoing other, more conservative treatments for her condition. It notes, for example, that in her call with Collin, Jue told Collin that she was being treated by Dr. Wu and might pursue corticosteroid shots. *See* Butler Decl., Ex. 12 at UA-CL-IDI-000274. It argues that in context, Collin's statement is best read as an assurance that Unum would not require surgery *at that time*. In further support of its position that it did not intend to waive its right to insist upon surgery, Unum states that shortly after Jue's call with Collin, a nurse reviewer suggested following up in six months because "steroid injections and/or surgery may be pursued" Butler Decl. Ex. 13. at UA-CL-IDI-000224, indicating that Unum still considered surgery a real possibility for Jue's case.

United States District Court
Northern District of California

I agree with Unum that whether it intended to waive its right to insist upon surgery as an appropriate treatment in Jue's case cannot be resolved as a matter of law on these facts. Jue's waiver argument rests heavily on a single statement from a claims representative in 2001. While the statement could be interpreted as a waiver, Unum makes a strong argument that, when read in context, the statement could also be interpreted as Unum assuring Jue that it would not insist upon surgery *at that time* based on her then-existing condition and other available treatment options. In addition, Jue's waiver argument must be considered in the context of considerable back and forth and interactions between her and Unum over more than a decade following her call with Collin. These facts, including the fact that the parties did not discuss whether surgery might be required under the policy at any point following Jue's 2001 call, is open to multiple readings and interpretations. A reasonable fact finder could find waiver on these facts, but could also find that Unum did not waive its right to insist upon surgery. As a result, the issue of waiver is not suitable for resolution at the summary judgment stage. *See Old Republic*, 80 Cal. App. 4th at 679 (finding waiver claim "not resolvable as a matter of law" where there was conflicting evidence as to the party's intent to waive). For this reason, Jue's motion for summary judgment is DENIED on the issue of waiver.

### 2.    Estoppel

Equitable estoppel may be applied in the insurance context where "(1) The [insurer] to be estopped has engaged in blameworthy or inequitable conduct; (2) that conduct caused or induced the [insured] to suffer some disadvantage; and (3) equitable considerations warrant the conclusion that the [insurer] should not be permitted to exploit the disadvantage [it] has thus inflicted upon [its insured]." *City of Hollister v. Monterey Ins. Co.*, 165 Cal. App. 4th 455, 488 (2008); *see also August v. Provident Life and Acc. Ins. Co.*, 772 F. Supp. 2d 1197, 1205 (C.D. Cal. 2001) (applying *Hollister* in a disability insurance action). Jue fails to meet each element of the *Hollister* test.

First, Jue has failed to establish that Unum engaged in "inequitable conduct." She argues that Unum engaged in inequitable conduct because it told her in 2001 that it would not insist that she obtain surgery as a condition of receiving benefits and failed to correct this representation for fifteen years. Jue Mot. at 13. She asserts that this conduct violated Unum's "common law

United States District Court
Northern District of California

obligation to assist the insured to recover bargained-for policy benefits," and its broad "duty to speak." *August*, 772 F. Supp. 2d at 1206.   She further contends that "in situations in which an insured's lack of knowledge may potentially result in a loss of benefits or a forfeiture of rights, an insurer has been required to bring to the insured's attention relevant information so as to enable the insured to take action to secure rights afforded by the policy."   *Davis v. Blue Cross of No. Cal.*, 25 Cal. 3d 418, 428 (1979).

Unum's conduct in this case does not appear to run afoul of these duties.  Collin's representation to Jue in 2001 that Unum would not require her to obtain surgery was accurate at that time and for the next fifteen years.  Unum paid Jue disability benefits for that entire period without requiring her to get hand surgery.  In 2017, after conducting a new review of Jue's condition and treatment options and determining that surgery was the appropriate treatment at that time, Unum directly informed her of this requirement.  It then gave her an opportunity to have the surgery and only terminated her benefits when, after several months, she declined to do so.  Jue has failed to establish that Unum engaged in "inequitable conduct" by failing to apprise her of relevant facts or terms of her policy.

Second, Jue has failed to establish that Unum's conduct caused disadvantage to her.  She makes several claims of disadvantage, none of which are persuasive.  She argues that information and evidence supporting her waiver argument and years of conservative treatment are not available because former employee Collin could not be located and two doctors who approved her conservative course of treatment over the years, Dr. LoCascio and Dr. Wu, have passed away.  Jue Mot. at 14-15.  But it is unlikely that Collin, if located, would have been able to provide additional meaningful support for Jue's waiver argument.  Jue does not contend that she had any additional discussions with Collin on this topic, and it is unlikely that Collin would be able to provide significant detail regarding a single phone call from 2001 beyond what is contained in her fairly detailed contemporaneous notes from the call.  Further, while Dr. LoCascio and Dr. Wu, if available, may have been able to provide some support for Jue's conservative course of treatment in 1999 and Jue's decision not to pursue surgery in the early 2000's, these facts are not relevant to whether De Quervain's surgery was the appropriate course of treatment for Jue's condition in

2018 when Unum terminated her benefits.  Because Unum's decision was based on Jue's condition at that time, the unavailability of these doctors does not cause any disadvantage to Jue.

Jue also argues that she has been disadvantaged because, in reliance on Unum's representation that she would not need to have surgery, and believing that Unum would "continue[] to pay benefits without question," she transitioned away from clinical dentistry.  Jue Mot. at 15; Jue Decl., ¶ 43.  She asserts that, as a result of this transition away from dentistry, she would struggle to find a full-time clinical position now even if she was physically able to do the work.  *Id.*

This argument is not convincing for multiple reasons.  First, as is well documented by the evidence submitted by both parties, Jue transitioned away from the practice of clinical dentistry because of persistent De Quervain's syndrome, which has prevented her from practicing dental work for more than a few hours a couple of days a week for many years.  She did not "transition out of clinical dentistry" because of Unum's representations, but because of her disability, which prevented her from working as a dentist.  Further, this harm is speculative and theoretical.  She does not claim that she has the physical ability to work as a dentist nor the desire to do so.  And, even if her condition resolved and she was able to work, any trouble in finding a job due to her long absence from the profession would be the result of her long-term disability, which Unum did not cause.

Jue finally argues that she has been disadvantaged because, if Unum had mandated surgery as the "appropriate treatment" earlier, she could have considered its position at a time when she was far younger and when she would have had a better chance of a successful surgical outcome.  Jue Mot. at 15.  But she admits that her doctors recommended surgery as early as 2000 and that she was reluctant to undergo the procedure due to concerns over possible complications.  She had the opportunity to consider surgery when she was younger and did.  Any negative health effects resulting from her decision not to pursue surgery when she was younger is the result of her personal decisions regarding what treatment to undertake.

Third, and finally, Jue has failed to show that equitable considerations warrant preventing Unum from exploiting any disadvantage caused to her.  As discussed above, she has failed to

United States District Court
Northern District of California

1  convincingly show that Unum's conduct has caused her any disadvantage.  As a result, she cannot

2  establish this element.

3       For the reasons discussed above, Jue has failed to carry her burden of showing that Unum

4  should be estopped from requiring surgery as an "appropriate treatment" for her condition.

5       Jue's motion for partial summary judgment on her contract claim is DENIED.

6  **II.   UNUM SUMMARY JUDGMENT MOTION**

7       Unum has moved for partial summary judgment on Jue's good faith and fair dealing claim

8  and on her request for punitive damages.

9       **A.   Good Faith and Fair Dealing Claim**

10       Unum moves for summary judgment on Jue's good faith and fair dealing claim, arguing

11  that Jue cannot possibly succeed on this claim because there is a "genuine dispute" whether Unum

12  was justified in withholding benefits.  Dkt. No. 33 ("Unum Mot.") at 16.

13       In the insurance context, "[t]he key to a bad faith claim is whether or not the insurer's

14  denial of coverage was reasonable." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir.

15  2001).  While the reasonableness of an insurer's claims decisions is generally a fact question "a

16  court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so

17  long as there existed a genuine issue as to the insurer's liability." *Lunsford v. Am. Guar. & Liab.*

18  *Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994).  "The genuine issue rule in the context of bad faith

19  claims allows a district court to grant summary judgment when it is undisputed or indisputable that

20  the basis for the insurer's denial of benefits was reasonable—for example, where even under the

21  plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California

22  law." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir. 2002).

23       The "genuine dispute" rule is evaluated under an objective standard and "[i]f conduct of

24  the insurer in denying coverage was objectively reasonable, its subjective intent is irrelevant."

25  *CalFarm Ins. v.* Krusiewicz, 131 Cal. App. 4th 273, 287 (2005).  Under California law it is not

26  unreasonable for an insurer to "give its own interests consideration equal to that it gives the

27  interests of its insured," *Fraley v. Allstate Ins. Co.*, 81 Cal. App. 4th 1282, 1292 (2000), or "to

28  resolve good faith doubts about the claim against the claimant." *Phelps v. Provident Life & Acc.*

United States District Court
Northern District of California

*Ins. Co.*, 60 F. Supp. 2d 1014, 1022 (C.D. Cal. 1999).  Conduct that has been found to be unreasonable includes: (1) failing to thoroughly investigate the foundation for the denial of benefits, *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal. 3d 809, 818-819 (1979); (2) ignoring, or failing to obtain readily available evidence that supports coverage, *Mariscal v. Old Republic Life Ins. Co.*, 42 Cal. App. 4th 1617, 1624 (1996); and (3) unreasonably interpreting the policy language to effectuate a denial, *Amadeo*, 290 F.3d at 1162-63.

Reviewing the facts in the light most favorable to Jue, I agree with Unum that there is a "genuine dispute" whether Unum was justified in terminating Jue's benefits and that no reasonable jury could conclude that Unum acted unreasonably.  The dispute in this case centers on whether the "appropriate care" language in Jue's policy required her to undergo De Quervain's surgery at the time Unum terminated her benefits in 2018.  Unum notes that courts have interpreted similar "appropriate care" policy language to require an insured to "seek and accept appropriate care for his disabling condition."  *Henry v. Provident Life & Accident Ins. Co.*, 106 F. Supp. 2d 1002, 1004-1005 (C.D. Cal. 2000).  The court in *Henry* further concluded that there was a triable issue whether appropriate care in that case required the insured to undergo carpal tunnel syndrome release surgery.  *Id.* at 1005.  Jue herself "recognizes that under some circumstances, surgery may be the only form of appropriate treatment," Jue Opp. at 20, and in her summary judgment motion argues that Unum "knew that is *could* insist upon surgery as a form of 'appropriate care' in order for its insured to be eligible for benefits" Jue Mot. at 11.  The key question then is whether Unum has submitted sufficient evidence to demonstrate a "genuine dispute" whether De Quervain's surgery was the "appropriate treatment" in Jue's case when it terminated her benefits.  It has.

The key facts are not in dispute.  After years of paying Jue disability benefits and requiring relatively minimal documents and updates from her, in 2015 her case was reassigned to Unum's validation unit, known for more active claims management.  *See supra*, Background, Section F.  The validation unit determined that Jue's medical documentation was out of date and requested updated claims documents from her, including an attending physician statement.  *Id.*  In 2016, Dr. Hsu submitted a statement on her behalf that confirmed her current disability and work restrictions.  *Id.*  Unum then had its consultant Dr. Groves, a hand surgeon, perform a medical

United States District Court
Northern District of California

review of Jue's file. *Id.* Dr. Groves felt that her medical documentation did not clearly support her current restrictions and contacted Dr. Hsu to discuss her case. *Id.* Dr. Hsu agreed with Dr. Groves that it would make sense to refer Jue to have an independent medical examination to assess her condition and treatment options. *Id.* In 2017, Dr. Masem, a hand surgeon, conducted such an examination and determined that Jue had a persistent case of De Quervain's and that surgery was the appropriate treatment for her condition. *Id.* Dr. Groves reviewed Dr. Masem's report and agreed that surgery appeared appropriate. *Id.* Unum then informed Jue that it believed hand surgery was the appropriate treatment for her condition and that it would discontinue benefits if she did not schedule surgery within 90 days. *Id.* In 2018, Jue informed Unum she was consulting with a hand surgeon, Dr. Kilaru, and Unum agreed to delay any termination of benefits so it could consider Dr. Kilaru's opinion. *Id.* Jue was examined by Dr. Kilaru, who prescribed an anti-inflammatory and attempted to treat her wrist issues with corticosteroid shots. *Id.* After the shots did not resolve the problem and provided only temporary relief, he too concluded that hand surgery was the appropriate next step in her treatment. *Id.* Jue did not get hand surgery and Unum accordingly terminated her benefits in May 2018. *Id.* During the appeals process Jue submitted a note from Dr. Hsu indicating that Dr. Hsu believed that Jue's concerns regarding the hand surgery were valid because nobody could guarantee that the surgery would be successful or would not worsen her condition and that conservative treatment and management was therefore appropriate care for Jue's case. *Id.* Unum reviewed Dr. Hsu's note but concluded that the opinions of Dr. Kilaru, Dr. Masem, and Dr. Groves were more persuasive and confirmed its termination of Jue's benefits. *Id.*

Based on these facts, I conclude that Unum's validation team's investigation and assessment of her condition and treatment options was thorough and fair. Over nearly three years, Unum consulted multiple doctors, including Jue's personal physician, an independent medical examiner, and a hand surgeon of Jue's choosing to assess her condition. Three different hand specialists agreed that the appropriate treatment for Jue was De Quervain's surgery and that the surgery was low-risk and likely to significantly improve her condition, possibly allowing her to return to work full time. After surgery was identified as the appropriate treatment, Unum still

1     allowed Jue an opportunity to see if alternative treatments from Dr. Kilaru would resolve her

2     condition.  Even Dr. Hsu, Jue's general physician, did not dispute that the surgery would be an

3     appropriate treatment for Jue, but determined that conservative treatment was also appropriate,

4     given her reluctance to obtain the surgery.  Jue has not submitted any evidence suggesting that

5     Unum failed to investigate key aspects of her condition or failed to consider relevant medical

6     information.  She does not dispute that "under some circumstances, surgery may be the only form

7     of appropriate treatment."  Jue Opp. at 20.  The facts show that Unum conducted a thorough and

8     fair investigation, considered all relevant medical evidence, and made a reasonable conclusion that

9     the appropriate treatment for Jue's case was hand surgery.  I therefore find that there is a genuine

10    dispute whether Unum was justified in denying benefits and that Unum did not act unreasonably

11    in its investigation, review, and treatment of Jue's claim.

12         Jue makes several arguments in opposition to Unum's summary judgment motion, none of

13    which are convincing.  First, she contends that it was unfair for Unum to investigate the

14    appropriate treatment for her condition because an Unum representative had told her in 2001 that

15    Unum would not force her to have surgery.  Jue Opp. at 20.  This argument makes little sense –

16    there is no reason why this statement in 2001 would make it unfair for Unum to investigate her

17    claim in 2018 and determine what the appropriate treatment for her condition was.  To the extent

18    Jue is arguing it was unfair for Unum to require surgery, after previously telling her surgery was

19    not required, I disagree.  The mere fact that Unum reached different conclusions about the

20    appropriate medical treatment for Jue's condition seventeen years apart does not make its later

21    conclusion unreasonable.  As discussed above, Unum conducted a thorough investigation into

22    Jue's condition from 2015 to 2018 and its determination that the appropriate treatment for Jue's

23    condition at that time was hand surgery was well supported by medical experts.

24         Second, Jue argues that Unum's investigation into her condition was untimely.  Jue Opp. at

25    20.  While it certainly appears that Unum took a lax approach to the management of Jue's claim

26    for some years, it is unclear how this was in any way unfair to her or evidence of bad faith.

27    Unum's investigation into Jue's condition starting in 2015 was into her condition at that time and

28    the appropriate treatment for her condition at that time.  Unum is permitted to assess an insured's

entitlement to benefits on an ongoing basis, including investigating an insured's current condition and treatment options.  Accordingly, Unum's potential failure to closely investigate Jue's claim prior to 2015, when it was paying her disability benefits, is not relevant to whether its later investigation and termination of benefits was reasonable.

Third, Jue suggests that Unum intentionally misapplied its policy to interpret "appropriate treatment" as treatment designed to facilitate a return to full-time work.  Jue Opp. at 20.  However, whether "appropriate treatment" should be interpreted to mean treatment that can facilitate a return to full-time work is an unresolved question.  Jue has not convincingly argued that Unum's interpretation is facially unreasonable or that Unum intentionally misapplied the policy language.  Further, even if "appropriate treatment" should not be read to require treatment that may return an insured to full-time work, Unum has submitted substantial evidence indicating that multiple doctors determined De Quervain's surgery was "appropriate treatment" for Jue's condition and case.  As a result, Unum's decision to terminate benefits may have been justified under the plain language of the policy, which requires insureds to obtain "appropriate treatment."

Fourth, Jue argues that Unum knew surgery was not the appropriate treatment in her case because (1) it had previously acknowledged other treatments as appropriate for De Quervain's; (2) Unum told her in 2001 that it would not force her to have hand surgery; and (3) it approved her benefits for 18 years.  Jue Opp. at 20-21.  This argument is not persuasive.  These facts are all consistent with Unum reasonably determining that surgery was the only appropriate remaining treatment for Jue after all other treatment options were exhausted.  It is perfectly plausible that the "appropriate treatment" for a chronic condition might change over time; Unum's "flip-flop" regarding the appropriate treatment for Jue does not reflect bad faith.

Fifth, Jue argues that Unum's decision was unfair because Unum's validation unit operates on a quota system with the specific goal of denying long-term claims.  Opp. at 16-19.  However, the evidence she cites does not support this characterization.  The evidence indicates that Unum uses forecasts to estimate, in part, the number of claims likely to be terminated each month and that repeated failure to meet likely forecasts could be one metric Unum management would use to assess the validation unit employees' performance.  *See* Colman Decl., Ex. DD at 75:2-77:24

United States District Court
Northern District of California

(testimony from validation team manager acknowledging that Unum used forecasts and trend reports to estimate likely recoveries per month and that there could be consequences for failure to meet targets over time, "depending on the reason for the variance").  Unum's use of forecasts and metrics as a way to manage its business and assess employees is not on its own evidence of bad faith.  The evidence submitted indicates that Unum used these tools reasonably and did not enforce strict or rigid quotas based on these forecasts.  *See id.*  Moreover, the specific facts of Jue's case indicate that the validation team thoroughly investigated her claim, considered multiple physician opinions, and made a plausible determination that surgery was the appropriate treatment for her case over a three-year period.  The validation team's general use of metrics and forecasts does not demonstrate bad faith in Jue's case.

Finally, Jue argues that the "genuine dispute" doctrine does not apply because a dispute is not legitimate "unless it is founded on a basis that is reasonable under the circumstances."  Jue Opp. at 21 (citing *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 724, n.7 (2003).  She argues that Unum's decision was not reasonable under the circumstances for the same reasons discussed above.  For the same reasons already addressed, I disagree and conclude that there is a reasonable and genuine dispute whether Unum was entitled to terminate Jue's benefits.

For these reasons, I agree with Unum that there is a "genuine dispute" whether Unum was justified in denying Jue's claim.  Unum's motion for summary judgment concerning Jue's good faith and fair dealing claim is GRANTED.

### B.   Punitive Damages

Unum also moves for summary judgment on Jue's demand for punitive damages, arguing that Jue cannot meet California's heavy punitive damages standard of showing "malice, fraud or oppression" by "clear and convincing" evidence.  Unum Mot. at 20.  I agree.

California sets a high standard for recovering punitive damages.  "The party requesting punitive damages must come forward with 'clear and convincing' evidence of fraud, oppression, or malice that is 'sufficiently strong to command the unhesitant assent of every reasonable mind.'" *Porsandeh v. Prudential Prop. & Cas. Ins. Co.*, Case No. CV-02-5343-EFS (SHx), 2004 WL 5642440, at *8 (C.D. Cal. Apr. 30, 2004) (citing *In re Angelis P.*, 28 Cal. 3d 908, 919 (1981).

United States District Court
Northern District of California

California courts have noted that this includes conduct that is "so vile, base, contemptible, miserable, wretched or loathsome that is would be looked down upon and despised by ordinary decent people," *Stewart v. Truck Ins. Exch.*, 17 Cal. App. 4th 468, 483 n. 29 (1993), and conduct "conceived in a spirit of mischief or with criminal indifference towards to obligations owed to others," *Kendall Yacht Corp. v. United California Bank*, 50 Cal. App. 3d 949, 958 (1975).

Jue has not submitted evidence sufficient to meet this high standard. As discussed above, the evidence indicates that Unum conducted a thorough, years-long investigation into her condition and appropriate medical treatment, considered the opinions of several different medical experts, including two physicians of her choosing, and made a reasonable determination that "appropriate treatment" in her case was De Quervain's surgery. This evidence is not sufficient to demonstrate bad faith and certainly does not meet the higher standard to establish punitive damages.

Jue argues that Unum acted in bad faith because its validation team operated on a quota system with the aim of terminating claims and because Unum has "unacceptable corporate practices." Jue Opp. at 23. As discussed above, the evidence she submitted regarding the validation team's use of forecasts does not support her characterization that the team operated on a rigid quota system to deny a certain number of predetermined claims each month. Nor has she presented any evidence or argument that these forecasts had any negative impact on her claim; the facts indicate that Unum conducted a thorough, fair, and lengthy investigation into her condition and the appropriate treatment for her case before terminating her benefits.

Jue also argues that Unum acted in bad faith because it "deliberately sought to downplay the known risks associated with the surgery when insisting that Dr. Jue must undergo the procedure as a condition to receiving benefits." Jue Opp. at 23. Her primary evidence for this is Unum's motion, which she argues improperly characterizes the surgery as "minor." Jue Opp. at 7-8. But Unum's arguments from counsel, years after Unum denied Jue's benefits, is not evidence. Her only other cited evidence on this point is deposition testimony from Dr. Groves and Dr. Kilaru, who testified that a rare complication of De Quervain's surgery is injury to the radial nerve. *See* Colman Decl., Ex. J at 34:10-35:12, 41:14-42:15; Colman Decl., Ex. Q at 56:5-59:8.

But she does not submit any evidence to support the idea that Unum did not consider this possible risk in assessing the appropriate treatment for her case. This testimony is consistent with Unum's records, which reflect that complications for De Quervain surgery are uncommon. *See* Colman Decl., Ex. B at UA-CL-IDI-002769 (independent medical examination memorandum noting that "[t]he complication rate from DeQuervain's surgery is extremely low"). Further, Dr. Kilaru testified that he informed Jue that possible risks of De Quervain's surgery included "injury to tendons, nerves, blood vessels" resulting in possible "stiffness, weakness, or pain" strongly suggesting that Dr. Kilaru was aware of, and specifically considered this possible risk, when he determined that surgery was appropriate for Jue's condition. Coleman Decl., Ex. Q at 44:23-45:16.

Finally, Jue points to various cases in which punitive damages have been upheld, claiming that these cases reflect conduct that is "far less severe" than Unum's actions here. Jue Opp. at 23. Neither case is comparable to the facts here. In *Mazik v. Geico*, 35 Cal. App. 5th 455, 470 (2009), the California Court of Appeal upheld a punitive damage award where the defendant had "approv[ed] settlement offers that ignored [plaintiff's] serious and permanent injuries." And in *Little v. Stuyvesant Life Ins. Co.*, 67 Cal. App. 3d 451, 462-463 (1977), the court upheld punitive damages where the insurer had relied on physician opinions, but had withheld relevant medical information from the physicians on which it relied. Jue does not allege any comparable facts to those at issue in *Mazik* or *Little*: there is no evidence that Unum ignored or disregarded medical information regarding Jue's condition or that Unum failed to provide full and accurate information to the physicians who examined and opined on the appropriate treatment in her case.

Jue has failed to provide clear and convincing evidence that Unum acted with malice, oppression, or fraud in terminating her disability benefits. Unum's motion for summary judgment concerning Jue's punitive damages demand is GRANTED.

## III.   MOTIONS TO SEAL

Jue has filed an administrative motion to seal certain documents that have been designated confidential by Unum. *See* Dkt. No. 35. Unum has also filed an administrative motion to seal certain documents that it has personally designated confidential. *See* Dkt. No. 40. It has not

submitted a declaration in support of either motion, as required by Local Rule 79-5, but has instead filed two declarations requesting additional time to file substantive supporting declarations, which defense counsel was not able to secure at the time the motions were initial filed due to the holiday season. *See* Dkt. No. 39; Dkt. No. 40-1.  Accordingly, Unum will have four days from the date of this order to file a substantive supporting declaration to justify sealing the documents provisionally filed under seal at Dockets No. 35 and 40.

**CONCLUSION**

For the reasons discussed above Jue's motion for partial summary judgment on the breach of contract claim is DENIED.  Unum's motion for partial summary judgment as to the breach of implied covenant of fair dealing claim and punitive damages demand is GRANTED.  Unum will have four days to file a declaration in support of sealing the documents filed at Docket Nos. 35 and 40.

**IT IS SO ORDERED.**

Dated: February 8, 2021

William H. Orrick
United States District Judge